**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STEVEN A. KALB,

Plaintiff,

- against -

OFFICE MAX, INC.

Defendant.

**NOTICE OF**
**REMOVAL**

Case No. _05 CV 8534_

New York Supreme Court,
New York County
Index No. 11255/05

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant OfficeMax, Contract Inc., f/k/a Boise Cascade Office Products Corporation (improperly sued as Office Max, Inc.), by its attorneys, Nixon Peabody LLP, hereby remove the above-captioned action to the United States District Court for the Southern District of New York, and respectfully state as follows:

1.  On September 14, 2005, defendant OfficeMax Contract, Inc., f/k/a Boise Cascade Office Products Corporation, (improperly sued as Office Max, Inc.), ("hereinafter "OfficeMax"), was served with a Summons and Complaint in the action entitled <u>Steven A. Kalb v. Office Max, Inc.</u>, Index No. 112555/2005, commenced in the Supreme Court of the State of New York, County of New York.  Pursuant to 28 U.S.C. § 1446(a), OfficeMax annexes hereto as Exhibit "A", a copy of the Summons and Complaint, the only process, pleadings and orders served to date, in this action.

2.  The Complaint arises from unlawful employment violations of the NYSHRL § 290 <u>et seq.</u> and NYCHRL § 8-101 <u>et seq.</u> based upon age and religious discrimination, and unlawful retaliation against plaintiff.

G281701.1

3.    The Complaint asserts causes of action for unlawful employment violations in excess of $10 million dollars in damages and asserts punitive damage claims in excess of $10 million dollars.

4.    The basis for the removal of this action from the New York State Supreme Court, New York County to the United States District Court, Southern District of New York, is "diversity of citizenship" pursuant to 28 U.S.C. §§ 1332 and 1441.

5.    According to the complaint, Plaintiff, Steven Kalb is an individual who resides in Stamford, Connecticut.  Upon information and belief, Steven Kalb is a citizen of the state of Connecticut for the purposes of diversity jurisdiction.

6.    Defendant OfficeMax is a Delaware corporation with a principal place of business in Ithasca, Illinois.  As such, there is "diversity of citizenship" between plaintiff and defendant within the meaning of 28 U.S.C. §§ 1332 and 1441.  Moreover, the amount in controversy in this matter plainly exceeds the sum or value of $75,000, exclusive of interests and costs pursuant to 28 U.S.C. § 1332.  Therefore, this Court has original jurisdiction of the action pursuant to 28 U.S.C. § 1332(a)(1), and removal of this action is proper pursuant to 28 U.S.C. § 1441.

7.    This notice of removal is being filed within the (30) days of the date (September 14, 2005) upon which defendant OfficeMax was served with a copy of the Summons and Complaint.  Therefore, this Notice of Removal is being timely filed pursuant to 28 U.S.C. § 1446(b).

8.    By removing this action, OfficeMax does not waive any rights, claims or defenses and OfficeMax expressly preserves its rights to assert any and all jurisdictional and other defenses.

G281701.1

9.    Written notice of the filing of this notice will promptly be given to plaintiff and, together with a copy of the Notice of Removal, will be filed with the Clerk of the Court of the Supreme Court of the State of New York, County of New York, as provided by 28 U.S.C. § 1446(d).

WHEREFORE, defendant OfficeMax, respectfully requests that the above-captioned action be duly removed from the New York State Supreme Court, New York County to this Court, and proceed herein.

Dated: October 4, 2005
      Garden City, New York

NIXON PEABODY LLP

By: _____
    Joseph J. Ortego (JO-3839)
    James W. Weller (JW-0545)
*Attorneys for Defendants,*
*OfficeMax Contract,, Inc.*
990 Stewart Avenue
Garden City, New York  11530
(516) 832-7500

TO:    Sack & Sack, Esqs.
    Jonathan S. Sack, Esq.
    Eric R. Stern, Esq.
    *Attorneys for Plaintiff*
    110 East 59th Street, 19th Floor
    New York, New York 10022

# EXHIBIT "A"

**SACK & SACK, ESQS.**
Jonathan S. Sack, Esq.
Eric R. Stern, Esq.
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
*Attorneys for Plaintiff, Steven A. Kalb*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------- x

STEVEN A. KALB,
               Index No. 112555/05

         Plaintiff,

    — against —
               **COMPLAINT**

               **JURY TRIAL REQUESTED**

OFFICE MAX, INC.,

         Defendant.
               **FILED IN COURT**
               DATE SEP 0 8 2005

-------------------------------------------------- x

Plaintiff, Steve A. Kalb ("*Plaintiff*"), by his attorneys, Sack & Sack, Esqs., as and for his complaint, alleges as follows:

## NATURE OF ACTION

1.    Plaintiff brings this action against his former employer, Office Max, Inc., previously known as Boise Office Products, LLC ("*Defendant*").

2.    Plaintiff complains that Defendant engaged in the unlawful discrimination of Plaintiff in the terms, conditions, and privileges of his employment in violation of New York State Human Rights Law, Executive Law § 290 *et seq.* ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 *et seq.* ("*NYCHRL*") based upon

his religion, Jewish.

3.    Plaintiff complains that Defendant engaged in the unlawful discrimination of Plaintiff in the terms, conditions, and privileges of his employment in violation of New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon his age, over 40.

4.    Plaintiff further complains that Defendant engaged in the unlawful retaliation of Plaintiff for his complaints regarding unlawful discrimination in the terms, conditions, and privileges of his employment in violation of NYSHRL and NYCHRL based upon his religion, Jewish.

5.    Plaintiff further complains that Defendant engaged in the unlawful retaliation of Plaintiff for his complaints regarding unlawful discrimination in the terms, conditions, and privileges of his employment in violation of NYSHRL and NYCHRL based upon his age, over 40.

## THE PARTIES

6.    Plaintiff currently resides at 237 Strawberry Hill Avenue, Unit #9, Stamford, Connecticut 06902, in the County of Fairfield and in the State of Connecticut.

7.    Plaintiff is a Jewish individual who was born on January 23, 1947, and is currently 58 years of age.

8.    Plaintiff is a Vietnam Veteran of the United States Armed Forces in which he served from 1964 through 1996 (during the Vietnam War).  Plaintiff received an honorable discharge on or about November 11, 1966.

2

9.     At all times relevant herein, Plaintiff is an employee protected under the State and City discrimination statutes protecting employees.

10.    Plaintiff is a talented and experienced sales professional, and has worked in the field of office furniture and supplies sales for over 35 years.

11.    Defendant is an office furniture and supplies business, the headquarters for which is located at 150 Pierce Road, Itasca, Illinois 60143.

12.    At all times relevant herein, Defendant is an employer within the meaning of State and City discrimination statutes protecting employees.

13.    Plaintiff was employed in Defendant's New York Office, whose address is 110 East 42nd Street, New York, New York.

## VENUE - JURISDICTION

14.    Venue is derived by virtue of the fact that Defendant maintains a place of business in New York County, and the transactions and events which give rise to this Complaint occurred out of the operation of Defendant's business and Plaintiff's employment in New York County.

## FACTS

The claims set forth herein arise from the following set of facts:

### 2001-2005: PLAINTIFF IS EMPLOYED BY DEFENDANT

15.    Immediately prior to his becoming employed by Defendant, Plaintiff was employed by Offices, Ltd.

16.    In or about November 2001, Plaintiff was contacted by James Durkin of Defendant's office with an invitation to become employed with Defendant.

3

17.    On or about November 26, 2001, Plaintiff was hired as a Furniture Business Development Manager by Madeline Cali, District Sales Manager.  His starting salary was approximately $100,000 per year.

18.    In respect to calendar year 2003, prior to Plaintiff's complaints of discrimination that are detailed herein, Plaintiff received glowing reviews complimenting his sales ability, his ability to get along with coworkers and ability to lead and mentor less experienced junior associates (the "*2003 Review*").

19.    Specifically, the 2003 Review attributed the following skills and contributions to Plaintiff, as described by his immediate supervisor, Madeline Hess:

| Category | Reviewer Comment |
|---|---|
| Building Strategic Working Relationships | Understands the importance of working with furniture operations.  Works well with credit department.  Adheres to company policies and processes to set up accounts, get deposits. |
| Building Trust | Develops an honest relationship with customer, communicating capabilities.  Sets expectations with customer and strives to overcommunicate.  Respectful of requirements for monthly reports and SFA updates. |
| Contributing to Team Success | Offers suggestions to fellow furniture associates drawing from a wealth of industry experience. |
| Decision Making | Uses furniture resources appropriately and effectively. |
| Initiating Action | High services level with existing client base. |

4

| Planning, Organizing | Excellent coordination of varied components of furniture business. |
| Sales Ability/Persuasiveness | Maintains long-term relationships because of emphasis on service. |
| Tenacity | Conscientious and pays due diligence to develop and work a plan with networking contacts and existing customers. |

20.    This glowing review was summarized as follows:

**Steve is an asset to the department for his wealth of industry knowledge and long term vendor relationships. The ability to keep long term customers and networking contacts is testimony to his emphasis on service and integrity. Steve has also been successful in developing new business and relationships with some OP accounts. Royal Bank of Scotland and Simon & Schuster are excellent examples to two office product accounts that Steve has cultivated and successfully made furniture clients.** (Exhibit "A")

### PLAINTIFF ENDURES HUMILIATION AT COMPANY EVENT

21.    For approximately the first three (3) years of his employment with Defendant, Plaintiff enjoyed a harassment-free workplace, where he enjoyed the ability to work and perform successfully while being judged by his very competent abilities and seasoned experience, and not by his age or religion.

22.    On Monday, January 19, 2004, an unfortunate event occurred at Defendant's annual sales kickoff meeting that provided Plaintiff with an astounding insight into the character of certain high-level individuals employed at Defendant. As shown herein, that event—and the actions of Plaintiff's supervisors following that

5

event—are consistent with an egregious bias against Plaintiff, who is Jewish, and over Fifty-five (55) years of age.

23.   Thereafter, and also as shown herein, Madeline Hess and other senior management of Defendant took action that can only be seen as retaliation because Plaintiff complained to Human Resources regarding the incidences on January 19, 2004, and prior to those complaints received remarkable reviews.

24.   The event of January 19, 2004, and management's retaliation following Plaintiff's complaint to Human Resources regarding that event, created a hostile work environment so egregious for Plaintiff that it resulted in Plaintiff's constructive discharge shortly following Plaintiff's complaints.

25.   The sales kickoff meeting took place at the Edith May Conference Center in Hawthorne, New York, and was attended by at least 100 people who were employees of Defendant and its subsidiaries, and included Plaintiff, his coworkers, superiors and subordinates.

26.   At the meeting, Defendant, unbeknownst to Plaintiff, hired an actor to be a "mystery guest" at the event.

27.   This "mystery guest" was actually an actor who was dressed as General Patton.

28.   The actor had "dossiers" on various employees and pulled out separate previously-prepared manila folders for each employee who was to be "roasted" by the actor.

29.   After a couple of non-personal comments directed towards Rick Lutz, General Sales Manager of location number 21 (covering New York and New Jersey) and Mike Zimet, General Manager of location number 21, the actor then proceeded to get a little more personal and raunchier.

30.   The actor directed his attention to Carol Russell, a district sales manager, and said, "**Carol.  Poor Carol.  She had the misfortune of spending an endless fifteen [15] hours sitting on a piece of cardboard outside of Grand Central during the 2003 blackout with Steve Kalb, who I will get to in a minute.**"

31.   Upon hearing this, the crowd of 100 supervisors, colleagues and subordinates began to clap and laugh.

32.   Plaintiff was shocked upon hearing his name, looked up in horror and fear as his heart began to pound from nervousness.

33.   The actor, directing his attention to the audience while pulling out a prepared manila folder, asked aloud, "**Where is Steve Kalb?**"

34.   Plaintiff, already sweating and not knowing what to expect, nervously raised his hand.

35.   Upon seeing Plaintiff, the actor, using personal and sensitive information that was undoubtedly provided to him by Defendant, said the following:   "**Did anybody know that Steve Kalb [Plaintiff] was abandoned by a family of wolves and adopted by Jewish accountants?**"

7

36.   Upon hearing this comment, Plaintiff felt his face turn flush.  Plaintiff heard the crowd of his superiors and, worse, subordinates, snicker.

37.   Plaintiff was embarrassed and humiliated when the Defendant-hired actor first called his name, but when Plaintiff heard the word "Jewish" followed by snickering, he felt sick.

38.   Plaintiff, who lost family during the Holocaust, was deeply offended and horrified by the callous comment made at this company-organized and paid-for event.

39.   Unfortunately for Plaintiff, the humiliation not only continued, but it got worse.

40.   The actor continued, **"Everyone who knows Steve knows he does not drink.  Do you know why?  Because his Jewish guilt gets in the way!"**

41.   Plaintiff was flushed and almost in tears as he heard his colleagues clap and roar in laughter.

42.   Plaintiff was stunned, mortified, embarrassed, humiliated and deeply offended.

43.   Plaintiff was nervous at what else Defendant told the actor about him.

44.   Despite silent prayers for the cessation of the actor's bit at the expense of Plaintiff's religion, the actor moved on to Plaintiff's age.

45.    The actor continued, **"I know something about Steve [Plaintiff] quite personal:  He cruises old age homes for dates!"**

46.    The crowd of superiors, subordinates and colleagues once again roared in laughter at Plaintiff's expense.

47.    Plaintiff used every muscle in his face and body to force a smile and brace himself to cover up the devastating humiliation and degradation he was suffering for no apparent reason, for the purpose of Defendant's entertainment.

48.    As a Jew and a married individual of the age of, at that time, fifty-seven (57), Plaintiff felt deeply offended.

49.    There is absolutely no legitimate business justification for the comments made to, and treatment of, Plaintiff in front of a crowd of 100 colleagues.

50.    Plaintiff was the only individual who was publicly targeted by the actor to be the victim of cruel and embarrassing comments based upon Plaintiff's age and religion.

51.    Defendant provided the actor with personal information about Plaintiff, without Plaintiff's permission or consent.

52.    Defendant knew, or should have known, that there was no legitimate business justification for providing the actor with personal information regarding Plaintiff's age and religion, and that providing such information would inevitably result in the actions that took place on January 19, 2004.

53.   Given the offensive nature of these remarks, some individuals made attempts at an apology.

54.   Claudia Mann, of Human Resources, asked in jest whether Plaintiff would be willing to accept a fruit basket in exchange for this unwarranted treatment.

55.   The horrific events that took place on January 19, 2004 was one of the worst and most humiliating evenings of Plaintiff's career, and there was no reason for those events to occur except to embarrass Plaintiff and entertain the employees of Defendant at Plaintiff's expense.

## PLAINTIFF IMMEDIATELY FILES A COMPLAINT WITH HUMAN RESOURCES; THEY DO NOTHING

56.   Despite the blatantly offensive remarks made to Plaintiff in pubic at a Defendant-sponsored event, no sincere investigation was conducted into this incident.

57.   Following the sales meeting, Plaintiff knew he had to formally report the incident to Human Resources; however, Plaintiff was (i) embarrassed by the remarks, (ii) humiliated that there actually came a point where he would have to complain about a work-related incident, and (iii) scared he would be retaliated against for making a complaint against his employer.

58.   On Tuesday, January 20, 2004, the day immediately following the incident, Plaintiff placed a call to Claudia Mann of Defendant's regional Human Resources department in Itasca, Illinois, to complain of the anti-Semitic and ageist remarks made at Defendant's annual sales meeting.

59.   Plaintiff demanded an apology from senior management and received a letter, dated January 21, 2004, from Mike Zimet, who admitted that the company's

decision to employ the comedian **"was a very bad idea."** (Exhibit "B")

60.    Ms. Mann asked Plaintiff if his boss, Mr. Moscaritolo apologized, as if he was requested to do so, to which Plaintiff responded, **"He [Mr. Moscaritolo] did not even come over to me."**

61.    In fact, Mike Zimet attempted to apologize to other Jewish employees.

62.    Mike Zimmet knew exactly which employees were Jewish.

63.    Since January 19, 2004, no representative approached Plaintiff to ask him about what took placed that evening, how he felt about what occurred and how it has affected him since those events took place.

64.    Shortly following Plaintiff's complaint to Human Resources, Mr. Moscaritolo, who witnessed first-hand the horrific events of January 19, 2004, curtly wrote in an email dated January 27, 2004: **"I am completing my involvement and investigation of the circumstances leading to the 1-19 meeting comments."**

65.    To this date, Plaintiff was never informed what Mr. Moscaritolo meant by "circumstances."

66.    On January 29, 2004, Ms. Mann called Plaintiff and informed him that **"the investigation into this matter is complete with apology."**

67.    Plaintiff never even knew an "investigation" was being conducted and was never approached by Defendant with a formal apology.

11

**PLAINTIFF RETAINS COUNSEL FOLLOWING DEFENDANT'S LACK OF ACTION**

68.    Upon realizing that Defendant was *sweeping this incident under the rug*, in or about mid February 2004, Plaintiff retained Howard J. Rubin, Esq., to represent him in protecting his rights regarding the despicable events that transpired on January 19, 2004.

69.    In a letter dated February 24, 2004 to Defendant's Chief Executive Officer, Chris Milliken, Mr. Rubin requested that Defendant "**conduct a full investigation of this [the January 19, 2004] incident so that it does not get swept under the carpet**." (Exhibit "C")

70.    Mr. Rubin's February 24, 2004 letter was written as a good-faith effort to resolve the incident of January 19, 2004 internally.

71.    Mr. Rubin's February 24, 2004 letter further urged Defendant to "**take proper steps so that this does not happen again and to ensure that Mr. Kalb [Plaintiff] is not retaliated against or disciplined in any manner for objecting to these anti-Semitic and ageist incidents**."

72.    Despite Mr. Rubin's letter and Plaintiff's formal and sincere complaint to Human Resources, little or no investigation was conducted by Defendant.

73.    In fact, Plaintiff was never informed whether a formal investigation was being conducted into Plaintiff's serious allegations with respect to his claims of discrimination, or what the proper investigatory procedures were, or whether these procedures were being followed by Defendant.

74.    If there was an investigation, no formal report or findings were ever produced to Plaintiff or his then-retained attorney, and no proof was ever provided that such a report exits.

## PLAINTIFF SUFFERS RETALIATION AS A CONSEQUENCE OF HIS COMPLAINTS OF DISCRIMINATION TO HUMAN RESOURCES

75.    A campaign of retaliation began almost immediately following Plaintiff's complaints regarding the discriminatory remarks made on January 19, 2004.

76.    On May 7, 2004, Plaintiff received a Memorandum from Madeline Hess ("*Hess*"), the same individual who, just a few months prior, gave Plaintiff's work very positive reviews.

77.    The memorandum focused on one aspect from the previous review in need of improvement—namely, Plaintiff's relationships with OP representatives.   (Exhibit "D")

78.    Less than six (6) weeks had passed since the glowing recommendation of the 2003 Review had been signed off on.

79.    The likelihood of Plaintiff's performance deteriorating so rapidly in less than six (6) weeks is suspect.

80.    In fact, Plaintiff received complements from OP reps, supervisory employees, and clients, praising his abilities during the 2004 period.

81.    It was clear to Plaintiff that members the management team implemented a plan to oust Plaintiff from his employment in retaliation of his prior lawful complaint.

82.    At that time, remarkably, Hess told Plaintiff that she did not write the

Memo, further suggesting that a decision has been made by other management personnel to begin the process by which Plaintiff would be discharged.

83.    It is extremely odd that Hess, feeling guilty, would deny drafting the May 7, 2004 Memorandum, especially considering she was Plaintiff's immediate supervisor.

## PLAINTIFF SUFFERS FURTHER DISCRIMINATION DESPITE COMPLAINTS TO HUMAN RESOURCES

84.    Remarkably, even though Defendant was on clear notice that it had problems with anti-Semitism, it did nothing to stop it – even following very serious complaints about it.

85.    From May 2004 through December 2004 various anti-semitic emails were circulated to numerous people within the company making blatant and scurrilous anti-Semitic remarks.

86.    Specifically, on December 13, 2004 an anti-Semitic email was circulated containing 16 "jokes" specifically targeted at Jewish mothers. (Exhibit "E")

## DEFENDANT INCREASES PRESSURE TO CREATE A CONSTRUCTIVE DISCHARGE

87.    On or about September 27, 2004, Plaintiff received an email from Tim Willins ("*Willins*"), District Sales Manager, regarding two situations in which Plaintiff purportedly raised his voice and spoke inappropriately. These complaints were regarding a clerk who was making numerous mistakes with Plaintiff's customers.

88.    In a letter dated October 4, 2004, Plaintiff was informed that his October 8th draw has been discontinued due to a negative volume incentive figure.

89.    On December 16, 2004, in a further attempt to compel Plaintiff to resign, Defendant simultaneously cut Plaintiff's pay and increased his sales quota, thereby

14

lowering his income potential.

90.    On or about December 21, 2004, Plaintiff received a Warning Letter from District Sales Manager Willins, in which the following two items are noted:  (Exhibit "F")

    a.   "Sales productivity below 2004 expectations"; and

    b.   "Continued inability or unwillingness to conduct yourself in a professional manner in dealings with other sales associates and managers."

91.    The Warning Letter indicates that failure to improve on these issues may result in disciplinary action, up to and including termination.

92.    The Warning Letter contradicts the positive 2003 Review in almost every respect.

93.    The Warning Letter even accused Plaintiff of creating a "hostile work environment" for his colleagues—a particularly ironic claim given that Plaintiff himself complained to be the victim of a hostile work environment created by his superiors.

94.    The Warning Letter advised that, **"Beginning on January 7th [2005] we will meet on a bi-monthly basis to monitor/speak about your performance."**

### PLAINTIFF IS CONSTRUCTIVELY DISCHARGED

95.    On January 16, 2005, notwithstanding the directive to "monitor" Plaintiff's performance, Defendant terminated Plaintiff's medical benefits.

96.    Following the immediate and suspect turn of events intended to "set up" Plaintiff for immediate failure and inevitable discharge, Plaintiff's then-counsel, Mr.

Rubin, again became involved in Plaintiff's horrific situation.

97.   On or about January 12, 2005, Mr. Rubin wrote a letter to Mr. Moscaritolo informing him of Plaintiff's constructive discharge.  (Exhibit "G")

98.   Mr. Rubin wrote:  **"It was a particularly sinister gesture to turn the hostile work environment claim on its head and accuse Mr. Kalb of creating a hostile work environment for other employees when in fact he is the victim of that himself."**

99.   Mr. Rubin further wrote:  **"Under the circumstances, the company has succeeded in driving Mr. Kalb from its employ."**

100.   Thereafter, without any prior warning, notice, cause, reason, justification or excuse, Plaintiff was summarily constructively discharged from his employment in retaliation of his complaints of discrimination based upon his religion and age.

101.   Plaintiff could not believe that rather than settling their differences in a professional and proper manner as urged numerous times by his counsel, Defendant decided to force a constructive discharge of Plaintiff's employment by so materially altering the terms, conditions and privileges of his employment with Defendant.

102.   Plaintiff was a top performing, hardworking employee with impeccable credentials who significantly contributed to Defendant's business, and maintained a reputation for himself as an honorable, ethical, and hard-working team player, until Defendant took the surreptitious actions complained of herein.

103.   Defendant failed to terminate and/or constructively discharge other

16

similarly situated co-workers who were performing in the same, and often times worse manner and fashion Plaintiff is accused of.

104.   Defendant has not applied the same grounds for termination to Plaintiff's co-workers who were not Jewish.

105.   Defendant has not applied the same grounds for termination to Plaintiff's younger co-workers.

106.   Plaintiff's termination is in retaliation for his prior lawful complaint.

107.   Plaintiff never exhibited any disloyalty to Defendant or its goals while performing the duties of his employment.  On the contrary, Plaintiff consistently exuded a strong sense of dedication to Defendant, trying every day of his employment to make Defendant's a better, safer and more productive environment.

108.   In fact, Plaintiff had brought over thirty-five (35) years of experience to Defendant and his credentials are unmatched.

109.   Despite Plaintiff's good intentions, Defendant undertook the unlawful actions described herein.

## LEGAL CLAIMS

110.   Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

## AS AND FOR A FIRST CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF RELIGION UNDER
### NEW YORK STATE HUMAN RIGHTS LAW § 290 ET SEQ.

111.   Plaintiff repeats and realleges each and every allegation contained in

paragraph 1 through 110 hereof as if the same were more fully set forth at length herein.

112.   Plaintiff was discriminated against by Defendant on the basis of his religion, Jewish.

113.   Plaintiff was qualified for the position he was employed in by Defendant.

114.   Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's religion, Jewish, and show an animus of religious bias.

115.   Defendant's animus towards Plaintiff's religion, Jewish, is revealed in instances where similarly situated non-Jewish employees were treated differently than Plaintiff in respect to of the terms, conditions, and privileges of employment.

116.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

117.   The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his religion and in retaliation against him in violation of the provisions of the NYSHRL § 290 et seq.

118.   As a proximate result of Defendant's aforementioned religious discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

119.   As a further proximate result of Defendant's actions, Plaintiff has and will

continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

120. As a further proximate result of Defendant's actions taken because of Plaintiff's religion, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

121. As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

122. As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $10,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

123. In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $10,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF AGE UNDER
### NEW YORK STATE HUMAN RIGHTS LAW § 290 ET SEQ.

124.    Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 123 hereof as if the same were more fully set forth at length herein.

125.    Plaintiff was discriminated by Defendant on the basis of his age, over 40.

126.    Plaintiff was qualified for the position he was employed in by Defendant.

127.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's age, over 40, and show an animus of age bias.

128.    Defendant's animus towards Plaintiff's age, over 40, is revealed in instances where similarly situated younger employees were treated differently than Plaintiff in respect to of the terms, conditions, and privileges of employment.

129.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

130.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his age and in retaliation against him in violation of the provisions of the NYSHRL § 290 et seq.

131.    As a proximate result of Defendant's aforementioned age discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment

benefits.

132.   As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

133.   As a further proximate result of Defendant's actions taken because of Plaintiff's age, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

134.   As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

135.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $10,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

136.   In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $10,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF RELIGION UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-101 et seq.

137.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 136 hereof as if the same were more fully set forth at length herein.

138.   Plaintiff was discriminated by Defendant on the basis of his religion, Jewish.

139.   Plaintiff was qualified for the position he was employed in by Defendant.

140.   Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's religion, Jewish, and show an animus of religious bias.

141.   Defendant's animus towards Plaintiff's religion, Jewish, is revealed in instances where similarly situated non-Jewish employees were treated differently than Plaintiff in respect to of the terms, conditions, and privileges of employment.

142.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

143.   The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his religion and in retaliation against him in violation of the provisions of the NYCHRL § 8-101 et seq.

144.   As a proximate result of Defendant's aforementioned religious discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other

employment benefits.

145.   As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

146.   As a further proximate result of Defendant's actions taken because of Plaintiff's religion, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

147.   As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

148.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $10,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

149.   In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $10,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF AGE UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-101 et seq.

150.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 149 hereof as if the same were more fully set forth at length herein.

151.   Plaintiff was discriminated by Defendant on the basis of his age, over 40.

152.   Plaintiff was qualified for the position he was employed in by Defendant.

153.   Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's age, over 40, and show an animus of age bias.

154.   Defendant's animus towards Plaintiff's age, over 40, is revealed in instances where similarly situated younger employees were treated differently than Plaintiff in respect to of the terms, conditions, and privileges of employment.

155.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

156.   The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his age and in retaliation against him in violation of the provisions of the NYCHRL § 8-101 et seq.

157.   As a proximate result of Defendant's aforementioned age discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment

benefits.

158.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

159.    As a further proximate result of Defendant's actions taken because of Plaintiff's age, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

160.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

161.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $10,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

162.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $10,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW § 290 ET SEQ.

163.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 162 hereof as if the same were more fully set forth at length herein.

164.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant was engaged in unlawful conduct under NYSHRL § 296 (1) (a).

165.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of religious and age discrimination to Defendant and appropriate authorities.

166.   Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of religious and age discrimination to Defendant and appropriate authorities.

167.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of religious and age discrimination to Defendant and appropriate authorities, Defendant engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating his employment.

168.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

169.   The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 290 et seq.

170.   As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of

26

past and future earnings, bonuses, deferred compensation and other employment benefits.

171. As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

172. As a further proximate result of Defendant's actions taken because of Plaintiff's sex and national origin, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

173. As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

174. As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $10,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

175. In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $10,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-101 et seq.

176.     Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 175 hereof as if the same were more fully set forth at length herein.

177.     Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant was engaged in unlawful conduct under NYCHRL § 8-101 et seq.

178.     Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of religious and age discrimination to Defendant and appropriate authorities.

179.     Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of religious and age discrimination to Defendant and appropriate authorities.

180.     As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of religious and age discrimination to Defendant and appropriate authorities, Defendant engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating his employment.

181.     Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

182.     The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-101 et seq.

183.     As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of

past and future earnings, bonuses, deferred compensation and other employment benefits.

184.   As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

185.   As a further proximate result of Defendant's actions taken because of Plaintiff's sex and national origin, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

186.   As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

187.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $10,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

188.   In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $10,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## ATTORNEYS' FEES AND COSTS

189.   Attorneys' fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with Defendant without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

190.   It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendant's obvious and blatant bad faith, wrongdoing and breach of other duties, *__punitive damages__* should be assessed against Defendant so that it be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.   An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salary and benefits had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%;

II.   An award of compensatory damages not less than $10,000,000.00;

III.   An award of punitive damages not less than $10,000,000.00;

IV.    An order enjoining Defendant from engaging in the wrongful practices alleged herein;

V.     An award of prejudgment interest, costs and attorney's fees; and

VI.    Such other and further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
       August 31, 2005

Respectfully submitted,
**SACK & SACK, ESQS.**

By:    Jonathan S. Sack, Esq.
       Eric R. Stein, Esq.

Attorneys for Plaintiff
**Steven A. Kalb**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

<u>CERTIFICATE OF SERVICE</u>

I, Laurie B. Cascino, hereby certify that a copy of the *Notice of Removal* by Defendant OfficeMax Contract Inc., f/k/a Boise Cascade Office Products Corporation (improperly sued as Office Max Inc.) in the above-entitled action was served on counsel for Plaintiff at the address listed below, via U. S. Mail on October 4, 2005.

SACK & SACK, ESQS.
Jonathan Sack, Esq.
*Attorneys for Plaintiff*
110 East 59th Street, 19th Fl.
New York, New York 10022-2050

Laurie B. Cascino (LBC 6147)

Dated:  October 4, 2005